IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE, )
)
v. ) I.D. No. 1710007866
)
ANDRE MURRAY, )
)
Defendant. )

Submitted: May 15, 2018
Decided: July 26, 2018

**MEMORANDUM OPINION**

*Upon Consideration of State's Motion for Reargument.*
**DENIED.**

Erika R. Flaschner, Esquire, DEPARTMENT OF JUSTICE, Wilmington, Delaware.
Attorney for the State.

Ross A. Flockerzie, Esquire, OFFICE OF DEFENSE SERVICES, Wilmington,
Delaware. Attorney for the Defendant.

**BUTLER, J.**

The Court has before it a Motion for Reargument in which the State seeks reconsideration of the Court's earlier ruling suppressing evidence derived from a warrantless arrest of the Defendant for want of probable cause. The State's Motion for Reargument is devoid of any reference to any fact the Court may have overlooked or any point of law not addressed in the Court's previous ruling. Rather, the State appears convinced that the Court's conclusion that the officer lacked probable cause was simply wrong, and the State is here inviting the Court to recognize its error, repent and be forgiven. Because the Court does not believe its ruling was in error, the Court rejects the State's invitation. The State's Motion for Reargument is therefore **DENIED**.

## FACTUAL BACKGROUND

To avoid the necessity of reading the Court's previous opinion for context, here is a brief review. In the late evening hours of October 13, 2017, three Wilmington police officers and one probation officer were on "proactive mobile patrol" in a single, unmarked vehicle. They were travelling northbound on South Franklin Street and were approaching a stop sign at the corner of South Franklin and Chestnut Street—a neighborhood described by the testifying officer as a "well-known high crime, high drug area."[1]

---

[1] Tr. 6:14-15.

While approaching said stop sign, Sergeant Rosaio, who was the driver and sole witness for the State, observed two men walking towards him—southbound on the sidewalk of South Franklin Street. Sergeant Rosaio saw that one of the two men was swinging his left arm naturally while holding his right arm close to his body. Sergeant Rosaio told the Court that he recognized the way the man was holding his arm near his body as a "characteristic of somebody who is armed with a handgun"[2] which, the officer testified, he had learned about at training seminars and indeed taught to other officers.[3]

When Sergeant Rosaio stopped in the middle of the lane and began exiting the undercover vehicle, the suspect turned his body away from the officer, which behavior the officer termed "blading" and this was enough, based upon his training and experience, for the officer to be "confident" that the suspect was armed and the suspect was thereupon ordered to the ground at gunpoint and a gun was indeed recovered from his waist area.[4]

So, the question was—and we suppose, remains—was there probable cause to point a gun at the suspect, order him to the ground, and take him into custody? The State maintains that there was because the Court must give deference to the

[2] Tr. 9:17-18.

[3] Tr. 4:3-5:9.

[4] Tr. 14:9-16:14.

officer's training and experience and the "armed gunman profile" on which he has been trained. Thus, according to the State, facts that might have benign significance to the casual observer take on this new significance in the eyes of a trained law man and that ought to be all the further the Court looks in considering the existence of probable cause.

For whatever reason, the suppression hearing in this matter came up just days before the scheduled trial date and the Court's written decision was rendered with very short notice. The Court will therefore expand on its earlier remarks herein, although the Court's ultimate conclusion remains unchanged.

### PARTIES' CONTENTIONS

In moving for reargument on the Defendant's Motion to Suppress, the State argues that the Court "misapprehended the facts and incorrectly applied controlling precedent."[5] Moreover, the State argues that the "Court's decision to disregard Sgt. Rosaio's testimony, based on his training and experience, was erroneous."[6] Defendant argues that the State's Motion for Reargument must be denied because the Court has not overlooked a controlling precedent or legal principle, or misapprehended the law or the facts.[7]

---

[5] State's Mot. for Rearg., D.I. 19, at 2.

[6] *Id.* at 10.

[7] Def.'s Resp. to State's Mot. for Rearg., D.I. 23, at 1-4.

4

## STANDARD OF REVIEW

Superior Court Civil Rule 59(e), made applicable to criminal cases by Superior Court Criminal Rule 57(d), permits the Court to reconsider "its findings of fact, conclusions of law, or judgment . . . ."[8] "Delaware law places a heavy burden on a [party] seeking relief pursuant to Rule 59."[9] To prevail on a motion for reargument, the movant must demonstrate that the Court "overlooked a controlling precedent or legal principle[ ], or the Court has misapprehended the law or facts such as would have changed the outcome of the underlying decision."[10] "A motion for reargument is not a device for raising new arguments,"[11] nor is it "intended to rehash the arguments already decided by the court."[12] Instead, the movant must demonstrate "newly discovered evidence, a change in the law, or manifest injustice."[13]

---

[8] *Hessler, Inc. v. Farrell*, 260 A.2d 701, 702 (Del. 1969).

[9] *Kostyshyn v. Comm'rs of Bellefonte*, 2007 WL 1241875, at *1 (Del. Super. Apr. 27, 2007).

[10] *Bd. of Managers of Del. Criminal Justice Info. Sys. v. Gannett Co.*, 2003 WL 1579170, at *1 (Del. Super. Jan. 17, 2003), *aff'd in part*, 840 A.2d 1232 (Del. 2003).

[11] Id.

[12] *Kennedy v. Invacare Corp.*, 2006 WL 488590, at *1 (Del. Super. Jan. 31, 2006).

[13] *E.I. du Pont de Nemours & Co. v. Admiral Ins. Co.*, 711 A.2d 45, 55 (Del. Super. 1995).

## ANALYSIS

In both its original arguments and its request for reargument, the State has been consistent. The argument is that because the defendant fit the "armed gunman profile" known to the arresting officer, the defendant's conformity with the profile was enough probable cause to justify his arrest. So it is useful to examine the subject of suspect profiles in the context of the Fourth Amendment.

In her book *Dangerous Instincts*, retired FBI profiling expert Mary Ellen O'Toole describes case after case of serial killers that avoided detection for years because they frequently present as friendly, harmless, and pleasant neighbors. It is a stark, if somewhat sensational, example of the dangers of drawing legal or forensic conclusions from little or no evidence but rather based upon our own suppositions and stereotypes.

The use of profiles in law enforcement may trace its origins to the FAA's effective efforts, in the 1960's, to curtail the problem of skyjacking.[14] The "drug courier profile" has received considerably more judicial scrutiny, and is worth considering in some detail.

---

[14] See generally, Thomas J. Andrews, *Screening Travellers at the Airport to Prevent Hijacking: A New Challenge to the Unconstitutional Conditions Doctrine*, 16 Ariz. L. Rev. 657, 712 (1974). See also, *U.S. v. Albarado*, 495 F.2d 799, 804 (2d Cir. 1974) (noting the dramatic drop in hijackings since the advent of the FAA profiling program).

To set the stage for the U.S. Supreme Court's treatment of the issue of drug courier profiles, we might first consider the following observations of the Maryland Court of Appeals in *Grant v. State*:[15]

> It is a convenient descriptive term without a great deal of legal significance. Some lament the fact that the Supreme Court has not yet told us whether meeting the so-called "drug courier profile" is an adequate predicate to establish either articulable suspicion for a stop or probable cause for an arrest or search. Of course, the Supreme Court has not told us that and they never will. Indeed, they cannot, for there is no such thing as a single drug courier profile; there are infinite drug courier profiles. The very notion is protean, not monolithic.[16]

The U.S. Supreme Court has had "drug courier profile" cases before it over the years, but has managed each time to avoid making its holdings based exclusively on the profile without reference to other intervening facts. For instance, in *United States v. Mendenhall*,[17] the defendant met the drug courier profile as employed by two DEA agents in the Detroit airport, but when she was approached, she consented to what happened next and the case therefore discusses what constitutes a "seizure" and whether her consent was freely given.

In *Reid v. Georgia*,[18] the Court reversed the Georgia Court of Appeals and reinstated the suppression of drug evidence seized from a late night airline passenger

---

[15] 461 A.2d 524 (Md. Ct. Spec. App. 1983).

[16] *Id.* at 526.

[17] 446 U.S. 544 (1980).

[18] 448 U.S. 438 (1980).

7

in the Atlanta airport. The DEA agent had testified that the defendant met a drug courier profile; the Court called such a profile "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics."[19] The Court concluded that suppression was appropriate. The agent's beliefs were little more than an "inchoate and unparticularized suspicion or 'hunch[.]'"[20] As to the profiled conduct of the suspected drug courier, the Court noted that "[t]he other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."[21]

In *United States v. Sokolow*,[22] the 25-year-old defendant went to the Honolulu airport and purchased a round trip ticket for himself and a woman to Miami, using an assumed name. He paid $2,100 in cash from a large roll of $20 bills. They returned to Honolulu three days later. Sokolow and his companion did not check any baggage. Upon his return, he was stopped by DEA agents as he was leaving the airport. A subsequent search of his luggage yielded cocaine.

---

[19] *Id.* at 440.

[20] *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)).

[21] *Reid*, 448 U.S. at 441.

[22] 490 U.S. 1 (1989).

The Supreme Court determined that the above facts gave rise to a reasonable suspicion to detain Sokolow briefly to determine whether their agents' suspicions were well founded. While we might call this "just another reasonable suspicion" case, it is significant in this respect: The Court ruled that the above facts gave rise to a reasonable articulable suspicion—standing alone. The Court specifically did not rely on the suppression hearing testimony that the defendant "had all the classic aspects of a drug courier."[23] Indeed, the Court repudiated the argument that its reasoning relied upon a "drug courier profile" at all.[24] The Court noted that "[a] court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion, but the fact that these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance as seen by a trained agent."[25]

From these cases, it is clear that the Court has never adopted a position remotely like the one advocated by the State here. While profiles may assist law enforcement in deciding which of a large number of individuals they might focus on for more concerted attention, the mere fact that someone fits a profile gives law

---

[23] *Id.* at 18 n.6.

[24] *Id.* at 10.

[25] Id.

enforcement, at most, a basis to investigate further.[26] In *Sokolow*, a case rife with reasonable suspicion, the agents were even permitted to detain the suspect for a period. But that detention was only to investigate the reasonable suspicion further, and it was only the further investigation that justified the arrest. In no case the Court has found, or any to which the Court is directed by the State, has the Court held that merely fitting some profile suffices to engage in a full on arrest of a suspect.

The drug courier profile has also been discussed by our own Supreme Court. Perhaps the best example for our purposes is *Harris v. State.*[27] Harris was an Amtrak train station stop by a Wilmington police officer who testified he had "trained extensively in the identification of couriers."[28] The officer also testified to initiating "an interdiction process in the city that [he] trained several people also to do that work."[29] The officer observed Harris get off a southbound Amtrak train from Philadelphia and, while exiting the platform, look back over his shoulder three times. Harris then went to the concourse and used a pay phone while talking to another person. From there he entered the back seat of a sedan and drove from the station,

---

[26] Indeed, as Sergeant Rosaio explained to the Court at the suppression hearing in this matter, "[t]hey're just things that we're aware of and that we can use as a tool." Tr. 5:8-9.

[27] 806 A.2d 119 (Del. 2002).

[28] *Id.* at 131 n.5.

[29] *Id.*

10

with police following. The police eventually blocked the vehicle from moving onto I-95 and arrested Harris at gunpoint, recovering cocaine from his backpack.

In considering the officer's drug courier profile testimony, the Delaware Supreme Court stated:

> Harris' behavior as described by the detaining officer, like that of the defendant in *Reid,* as consistent with "a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." This is precisely what the constitutional prohibition against unreasonable searches and seizures was designed to prevent.[30]

Thus, it is clear enough that "profiles" may aid law enforcement in picking and choosing the targets of their attention, a profile will not serve as a proxy for reasonable articulable suspicion unless the profiled behaviors at issue independently raise reasonable articulable suspicion. The Delaware Supreme Court's adjudication on profiling has not broken new or different ground from the U.S. Supreme Court at all.

The dangers of overreliance on profiles are graphically illustrated in Justice Marshall's dissent in *Sokolow.* Justice Marshall, quoting the Ninth Circuit below, noted that profiles have a "chameleon-like way of adapting to any particular set of

---

[30] *Id.* at 129.

11

observations."[31] He then references a string of cases in which the suspect conformed to the "profile" at hand: being the first to deplane, the last to deplane, or even deplaning in the middle; purchasing a one-way ticket or purchasing a round-trip ticket; taking on a nonstop flight or changing planes; traveling alone or traveling with a companion; acting nervously or acting too calmly.

Thus, it seems to the Court, while the use of a profile as a tool to assist law enforcement in picking which citizens to focus on may have its place, the mere fact that one such citizen matches some amorphous profile does not equate to sufficient evidence to order the suspect to the ground at gunpoint and take him into custody. Rather, where, as here, the "profile" consists entirely of benign, lawful behaviors without much independent legal significance, law enforcement must next develop the additional data points that support their suspicions before subjecting the citizen to a full on search, seizure, and arrest. That did not happen here. Nothing like that happened here. The Court therefore adheres to its original conclusion that the handgun seized as a result of taking Defendant to the ground at gunpoint based solely upon his fitting some abstract armed gunman profile composed entirely of benign, legal behaviors must be suppressed. Nothing the State has presented in the instant motion suggests that the Court misapprehended the facts or made an error of law.

---

[31] *Sokolow*, 490 U.S. at 13 (Marshal, J., dissenting) (quoting *United States v. Sokolow*, 831 F.2d 1413, 1418 (9th Cir. 1987), *rev'd*, 490 U.S. 1 (1989)).

12

## CONCLUSION

Because the State has not demonstrated that the Court overlooked a controlling precedent or legal principle or that the Court has misapprehended the law or the facts such as would have changed the outcome of the underlying decision on Defendant's Motion to Suppress, the State's Motion for Reargument is hereby **DENIED**.

**IT IS SO ORDERED.**

Judge Charles E. Butler

13